RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0244p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

―――――――――――

UNITED STATES OF AMERICA ex rel. MARJORIE
PRATHER,

*Relator-Appellant*,

*v.*

No. 15-6377

BROOKDALE SENIOR LIVING COMMUNITIES, INC. et
al.,

*Defendants-Appellees*.

―――――――――――

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:12-cv-00764—Aleta Arthur Trauger, District Judge.

Argued: August 4, 2016

Decided and Filed: September 30, 2016

Before: MOORE, McKEAGUE, and DONALD, Circuit Judges.

―――――――――――

## COUNSEL

**ARGUED:** Pat Barrett, BARRETT LAW OFFICE, PLLC, Nashville, Tennessee, for Appellant. Brian D. Roark, BASS, BERRY & SIMS, PLC, Nashville, Tennessee, for Appellees. **ON BRIEF:** Pat Barrett, BARRETT LAW OFFICE, PLLC, Nashville, Tennessee, Michael Hamilton, PROVOST UMPHREY LAW FIRM, LLP, Nashville, Tennessee, for Appellant. Brian D. Roark, J. Taylor Chenery, Angela L. Bergman, BASS, BERRY & SIMS, PLC, Nashville, Tennessee, for Appellees.

MOORE, J., delivered the opinion of the court in which DONALD, J., joined, and McKEAGUE, J., joined in part. McKEAGUE, J. (pp. 31–40), delivered a separate opinion concurring in part and dissenting in part.

1

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.   Marjorie Prather was hired by Brookdale Senior Living Communities to review documentation related to thousands of patients who were residents of Brookdale facilities and had received home-health services from Brookdale. Brookdale desperately needed this documentation to be reviewed because Medicare claims regarding those patients had been on hold for some time, and Brookdale potentially faced the recoupment of payments it had previously received for treating those patients if it did not review and submit final Medicare claims regarding the treatment—what Brookdale termed "a looming financial crisis."   R. 73 (Second Amended Compl. ¶¶ 3, 86) (Page ID #925, 945).   As she reviewed the documentation, Prather noticed that the required certifications from a doctor stating that the doctor had decided that the patient needed home-health services, established a plan of care, and met with the patient face-to-face, were signed well after the care had been provided. Prather repeatedly brought this issue to the attention of her supervisors, but was rebuffed, told to ignore the issues that she was seeing, and in one instance had her concerns brushed aside by an official who suggested "[w]e can just argue in our favor if we get audited."   *Id.* ¶ 99 (Page ID #950).   The urgency was such that Brookdale even began to pay doctors to complete the necessary paperwork—even though months had passed since the treatment had been provided to the patients.   Prather came to believe that Brookdale was not just asking the doctors who had cared for the patients all along to complete forgotten paperwork; rather, she surmised that Brookdale had provided the home-health services without enlisting a doctor's aid and then found doctors willing to validate the care after-the-fact.   Prather therefore brought a lawsuit under the False Claims Act, 31 U.S.C. § 3729 *et seq.*

The focal point of Prather's case is a claim that Brookdale submitted false Medicare claims to the government.   Prather suggests that Brookdale submitted the claims that she reviewed, and many others, knowing that those claims did not comply with Medicare regulations because they included physician certifications of the patient's need for home-health services that were completed well after the care had been provided.   The governing regulation suggests that

these certifications must be completed at the time the doctor establishes a plan for the patient's care "or as soon thereafter as possible," yet Brookdale waited months to obtain such certifications from doctors. Although the district court dismissed this claim, we **REVERSE** because completing the physician certifications months after the fact cannot be said to have been "as soon as possible" after the plan for a patient's care was established. We also reject the argument that Prather did not sufficiently plead the submission of particular claims to the government for payment because she provided a detailed description of the alleged fraudulent scheme, and included her own personal knowledge of the review of Medicare claims for submission—reviewing Medicare claims for billing purposes was Prather's job, after all. For those same reasons, we also hold that Prather sufficiently alleged that the defendants unlawfully retained Medicare payments that they had previously received for the same patients, but to which they were not entitled due to the same regulatory violations. We therefore **REVERSE** the dismissal of Prather's fraudulent-retention-of-payments claim. Finally, because Prather failed to plead with particularity the use of government forms to certify falsely that care had been provided under a doctor's orders, or that unnecessary care had been provided, we **AFFIRM** the dismissal of her false-records claim.

## I. BACKGROUND

### A. Statutory and Regulatory Background

Medicare Part A "provides basic protection against the costs of hospital, related post-hospital, home health services, and hospice care" for qualified individuals aged 65 and over. 42 U.S.C. § 1395c. Medicare Part B is "a voluntary insurance program to provide medical insurance benefits," 42 U.S.C. § 1395j, and it, too, provides coverage for certain "home health services," 42 U.S.C. § 1395k(a)(2)(A). Medicare-covered home-health services include: "[s]killed nursing services," "[h]ome health aide services," "[p]hysical therapy," "[s]peech-language pathology services," "[o]ccupational therapy services," and "[m]edical social services." R. 86-2 (2015 Medicare Benefit Policy Manual, Chapter 7 Home Health Services § 10.1[A]) (Page ID #1243).

A home-health agency receives its Medicare patients via referrals, and "Medicare Part A or Part B pays for home health services only if a physician certifies and recertifies" the patient's eligibility for and entitlement to those services. 42 C.F.R. § 424.22. The physician must certify that: (1) home-health services "are or were required because the individual is or was confined to his home . . . and needs or needed" covered home-health services; (2) "a plan for furnishing such services to such individual has been established and is periodically reviewed by a physician"; (3) "such services are or were furnished while the individual is or was under the care of a physician"; and (4) "prior to making such certification the physician must document that the physician . . . has had a face-to-face encounter . . . with the individual during the 6-month period preceding such certification." 42 U.S.C. § 1395n(a)(2)(A); *see also* 42 U.S.C. § 1395f(a)(2)(C) (listing nearly identical requirements under Medicare Part A). Medicare payments for home-health services are conditioned on these certifications being completed. *See* 42 C.F.R. § 424.10(a). These certifications provide "a forward-looking projection of medical need at the time the beneficiary's plan of care is established," R. 66 (Gov't Statement of Interest at 3) (Page ID #860) (emphasis omitted), ensuring that a patient receives Medicare services only to the extent she needs them.

Medicare payments for home-health services are made pursuant to "a prospective payment system," 42 U.S.C. § 1395fff(a), which uses a 60-day "episode of care" as its standard measurement. Reimbursement for services provided during each 60-day episode is paid to the home-health agency in two parts: An initial payment, commonly referred to as a "request for anticipated payment" or "RAP," which is a percentage of the anticipated episode payment, and a "residual final payment" that is paid after the end of the 60-day episode. *See* 42 C.F.R. § 484.205(b); R. 79-1 (2011 Medicare Claims Processing Manual § 10.1.12) (Page ID #1085). Payment, therefore, is not based on a fee-for-service model that would consider the precise treatments that were provided during the 60-day episode; rather, the entire episode payment "represents payment in full for all costs associated with furnishing home health services previously paid on a reasonable cost basis." 42 C.F.R. § 484.205(b).

**B. Factual Background**

Marjorie Prather "is a Registered Nurse . . . who was employed by Brookdale Senior Living, Inc. as a Utilization Review Nurse from September of 2011 until November 23, 2012." R. 73 (Second Amended Compl. ¶ 10) (Page ID #927). Brookdale Senior Living, Inc. and the other defendants (we refer to the defendants collectively as "Brookdale")—Brookdale Senior Living Communities, Inc.; Brookdale Living Communities, Inc.; Innovative Senior Care Home Health of Nashville, LLC ("Innovative Senior Care"); and ARC Therapy Services ("ARC")— "are interconnected corporate siblings who operate senior communities, assisted living facilities and home health care providers." *Id.* ¶ 3 (Page ID #925).

The business models of the Brookdale companies are also intertwined. Many of the Brookdale "retirement communities have nursing care and other health care services . . . on site for which the residents pay a 'monthly fee,'" while Innovative Senior Care and ARC "maintain offices in many of these facilities" and their "staff solicit referrals from the retirement community staff members on a daily basis." *Id.* ¶¶ 57–58 (Page ID #938). This connection came to include a scheme to utilize "aggressive marketing practices" by which the defendants sought to "enroll[] as many of their assisted living facility residents as possible in home health care services that were billed to Medicare." *Id.* ¶ 3 (Page ID #925). The scheme sought not only to enroll patients who needed home-health care services, but also allegedly crossed the line into pushing Medicare-billable services onto patients who did not need them. For example, Prather alleges that Innovative Senior Care nurses would "treat skin tears that would otherwise have been provided by assisted living facility nurses," and then bill Medicare, even though the same treatment would be provided "at no cost to Medicare" if done by nurses from the assisted-living facility. *Id.* ¶ 59 (Page ID #939).

As a result of this scheme to increase the number of Brookdale residents who received from one of Brookdale's affiliates additional medical care that could then be billed to Medicare, the defendants were left with "a backlog of thousands of [Medicare] claims." *Id.* ¶ 63 (Page ID #940). By September 2011, the backlog included 7,000 claims for final payment that were "worth approximately $35 million." *Id.* ¶ 66 (Page ID #940). The defendants allegedly expressed to Prather that this backlog constituted a "looming financial crisis," *id.* ¶¶ 3, 86 (Page

ID #925, 945), due at least in part to the fact that anticipated payments for the same episodes of care would be recouped by Medicare if the final request was not submitted, *see* 42 C.F.R. § 409.43(c)(2).

In view of this crisis, the defendants revamped the way in which they review and submit Medicare claims. They had previously delegated the submission of Medicare claims to "each office location of" Innovative Senior Care and ARC, R. 73 (Second Amended Compl. ¶ 65) (Page ID #940), but they began to centralize billing in their headquarters, commencing the Held Claims Project that forms the basis for Prather's case. *See id.* ¶¶ 63, 65 (Page ID #940). Prather was hired specifically "to work on the 'Held Claims Project' and she was terminated when it ended." *Id.* ¶ 64 (Page ID #940).

As the Held Claims Project began, "copies of patient charts concerning the held claims were forwarded to the Brentwood office to be audited and billed to Medicare." *Id.* ¶ 67 (Page ID #941). Prather reviewed these charts in anticipation of billing and worked with various Brookdale officials "to resolve documentation, coverage, and compliance issues," among other duties. *Id.* ¶ 69 (Page ID #941). These responsibilities, Prather claims, "directly related to Defendants' efforts to bill the held claims to Medicare," *id.*, and Prather "worked with employees in Brookdale's central billing office," *id.* ¶ 70 (Page ID #941). According to Prather, she and her colleagues followed a checklist of "items that needed to be completed before the claim could be released for final billing to Medicare"; "[o]nce the checklist was finished," it would be combined with other relevant materials, "taken to the employees in the billing office," and "immediately submitted . . . to Medicare." *Id.* ¶ 71 (Page ID #942).

At first, Prather and her colleagues "sent attestation forms to doctors for them to sign to correct the problem of missing signatures," but they received few responses. *Id.* ¶ 75 (Page ID #943). Brookdale's "management felt that this was 'a slow process.'" *Id.* Brookdale then began to push the nurses conducting the Held Claims Project to speed up their review of Medicare claims. On April 2, 2012, Lance Blackwood, Senior Director of the Home Health Product Line for Innovative Senior Care, *id.* ¶ 73 (Page ID #942), showed Prather an email from a Senior Vice President of Innovative Senior Care asking whether the reviewing nurses "were doing just a 'quick review' on the billing release checklists," and Blackwood indicated "that he thought the

charts were being reviewed too closely." *Id.* ¶ 76 (Page ID #943). On April 25, 2012, the same Senior Vice President emailed Prather and others, announcing that "all claims older than 120 days" would be returned to the local offices "to get the doctors to sign the old documents, as well as ask them to complete the face to face documentation," "emphasiz[ing] that '[t]here is a high sense of urgency to get these released ASAP." *Id.* ¶ 77 (Page ID #943).

The idea was that the claims would be documented by the local offices and then sent to the utilization-review nurses "who completed the final reviews and checklists in order to release the claims for billing to Medicare." *Id.* ¶ 79 (Page ID #944). But the nurses conducting this review "were instructed to only do a 'quick review' for missing signatures and dates, and were specifically instructed not to look for any other problems related to Medicare billing," and were "told to ignore" problems they did notice. *See id.* ¶ 80 (Page ID #944). For Prather, these instructions raised red flags. She told Blackwood that "she was finding compliance problems with face to face documentation, doctors['] orders and plans of care, and therapy evaluations," but Blackwood "told her that it was the agencies' responsibility to correct the charts, not hers." *Id.* ¶ 81 (Page ID #944). Prather complained to others "in the billing department," but had no luck. One person told her "there is such a push to get the claims through," *id.* ¶ 85 (Page ID #945), while one of Innovative Senior Care's Regional Vice Presidents suggested that "[w]e can just argue in our favor if we get audited," *id.* ¶ 99 (Page ID #950).

Around this time, Brookdale began a policy of paying doctors to complete the paperwork. *See id.* ¶ 87 (Page ID #945–46). Prather did not explain further the scope or efficacy of Brookdale's program of paying doctors to complete the paperwork.

Prather's concerns with the claims were based upon her own review of them. Many, she asserts, "did not comply with Medicare regulations." *Id.* ¶ 63 (Page ID #940). Although Prather suggests a number of problems with the claims she reviewed, the main issues were that care "was provided without physician certifications of need for home health services" or "without required face to face encounter documentation." *Id.* ¶ 66 (Page ID #940). In other words, the medical documentation regarding patients did not contain anything indicating that a doctor had found at the outset of the patient's treatment that the patient needed home-health care, or that

there was nothing in the file to indicate that the doctor had met with the patient face-to-face.[1] Prather suggests that these claims were submitted for payment after Brookdale obtained signatures and certifications from doctors, although those signatures and certifications were obtained months after the treatment had been provided.

Prather provides allegations regarding a representative sample of claims that were ultimately submitted to Medicare. She does so in two ways: (1) allegations regarding the specific circumstances of four representative patients, for whom she alleges both requests for anticipated payment and for final payment were submitted; and (2) spreadsheets listing information regarding hundreds of other claims that Prather asserts suffered from similar defects, for which she alleges only that requests for anticipated payment were submitted.

The four patients that Prather discussed each had physician certifications of need or face-to-face documentation completed well after their care had ended:

- Patient A "received home health care services from December 14, 2011, through February 11, 2012," yet "no doctor certified that she needed home health services until June 29, 2012," and her face-to-face documentation was not signed until February 24, 2012. *Id.* ¶¶ 90, 94 (Page ID #947–48). A request for anticipated payment was submitted in December 2011, and the defendants also "billed Medicare $800 for the final episode payment." *See id.* ¶ 91 (Page ID #947).

- Patient B "received physical therapy, occupational therapy, and skilled nursing services from September 9, 2011, to November 7, 2011." *Id.* ¶ 92 (Page ID #947). "The start of care order and the face to face encounter documentation were not signed by the doctor until June 4, 2012, and no physician certified that Patient B needed home health services until July 10, 2012." *Id.* ¶ 92 (Page ID #947–48). A request for anticipated payment was submitted on September 9, 2011, and the defendants later requested $3,200 for the final payment. *Id.* ¶ 93 (Page ID #948).

---

[1]Prather also alleges that some claims had "plan of care orders" for which "the primary diagnosis justifying home health care billing to Medicare was inconsistent with the care actually provided to the patient." *Id.* ¶ 90 (Page ID #946). Although she alleged two specific examples, *id.* ¶¶ 90, 95 (Page ID #946–48), Prather made clear that she "does not attempt to state a claim of medically unnecessary care as an independent ground of recovery." R. 85 (Opp'n to Mot. to Dismiss at 22–23) (Page ID #1151–52).

- Patient C "received skilled nursing services, physical therapy, and occupational therapy . . . from July 25, 2011, to September 22, 2011," and was then recertified for care between September 23, 2011 and November 21, 2011. *Id.* ¶ 95 (Page ID #948–49). "No physician certified Patient C's need for home health care services until December 12, 2011." *Id.* ¶ 95 (Page ID #949). Requests for anticipated payment were submitted around July 25, 2011 and September 23, 2011, and a final payment of $5,760 was received on July 5, 2012. *Id.* ¶¶ 96–97 (Page ID #949).

- Patient D was billed for care provided between January 10, 2012 and March 9, 2012, although "the doctor did not certify Patient D's need for home health care service until June 12, 2012." *Id.* ¶ 98 (Page ID #949). A request for anticipated payment was submitted around January 10, 2012, and a $1,920 final bill was submitted around June 22, 2012. *Id.*

Prather also provided lists of many other patients whose documentation was untimely. Exhibit A to the Second Amended Complaint "identified 489 claims that were submitted to Medicare in violation of the condition of payment that the physician certification of need for home health services must be obtained at the time the plan of care is established or as soon thereafter as possible," and listed "each claim by patient, certification period, the [Innovative Senior Care] Home Health Network that provided the subject home health services . . . and the Brookdale community where the patient received the home health services . . . ." *Id.* ¶ 100 (Page ID #950); *see* R. 73-1 (Ex. A to Second Amended Compl.) (Page ID #958–81). Exhibit B "identified 771 claims that were submitted to Medicare in violation of the condition of payment that an appropriate physician document a face-to-face encounter with the patient," and provided similar information about each claim. R. 73 (Second Amended Compl. ¶ 103) (Page ID #951); *see* R. 73-2 (Ex. B to Second Amended Compl.) (Page ID #982–1015). For each claim in Exhibits A and B, Prather alleges that a request for anticipated payment was submitted to Medicare, and that either the physician certification or the face-to-face documentation was obtained only after the treatment episode was over or the patient was discharged. *See* R. 73 (Second Amended Compl. ¶¶ 102, 105) (Page ID #951–52).

## C.  Procedural History

Prather filed this lawsuit on July 24, 2012, asserting various violations of the False Claims Act—along with similar state-law claims—arising out of what Prather viewed as deficiencies in many of the claims she had reviewed.  *See* R. 1 (Compl. ¶¶ 153–92) (Page ID #29–45).  The United States decided not to intervene in the case.  *See* R. 23 (Notice of Election to Decline Intervention) (Page ID #103–04).  At that point, the complaint was unsealed and served on the defendants, R. 24 (April 10, 2014 Order) (Page ID #107–08), but Prather filed an amended complaint before the defendants responded to the initial complaint, *see* R. 52 (First Amended Compl.) (Page ID #178–211).  The defendants moved to dismiss, R. 56 (First Mot. to Dismiss) (Page ID #217–19), and the district court granted the motion without prejudice, *see* R. 71 (Mar. 31, 2015 Op.) (Page ID #889–922).  The district court's main concern was that Prather had failed to plead specific facts identifying any false claim that was presented to the government for payment, instead relying on supposition and inference that specific claims for payment had been submitted.  *See* R. 71 (Mar. 31, 2015 Op. at 22–29) (Page ID #910–17).

Prather filed her Second Amended Complaint on June 1, 2015.  *See* R. 73 (Second Amended Compl.) (Page ID #924–57).  She narrowed the case to three legal claims:  (1) the presentation of false claims to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A); (2) the making or use of false records or statements that were material to the submission of those false claims, in violation of 31 U.S.C. § 3729(a)(1)(B); and (3) the failure to return overpayments, in violation of 31 U.S.C. § 3729(a)(1)(G).  *See id.* ¶¶ 106–22 (Page ID #952–55).  The defendants moved to dismiss, R. 78 (Second Mot. to Dismiss) (Page ID #1028–30), and the district court granted that motion in full, *see* R. 89 (Nov. 5, 2015 Op.) (Page ID #1358–1402).  The district court dismissed Prather's claim for the presentation of false claims for two reasons.  First, it held that Prather did not adequately plead the specifics of any presentment to Medicare of actual requests for anticipated payment.  *See* R. 89 (Nov. 5, 2015 Op. at 27–34) (Page ID #1384–91).  Second, the district court held that the portion of the presentment claim related to final payments was "sufficiently pleaded as to presentment," *id.* at 34 (Page ID #1391), but did not plead that the claims were false because Medicare regulations did not require the physician certifications to be documented until a request for final payment was submitted, *see id.* at 38–41

(Page ID #1395–98).   As for Prather's claim regarding the use of false records in seeking payment from the government, the district court held that Prather had failed to plead "sufficient detail regarding the time, place and content of the defendants' alleged false statements and the claim for payment." *Id.* at 41–43 (Page ID #1398–1400).   Finally, the district court dismissed Prather's claim regarding the unlawful retention of payments because Prather's failure to plead sufficient "presentment of false [requests for anticipated payment]" doomed any argument that such payments were wrongly retained. *Id.* at 43–44 (Page ID #1400–01).

## II.  ANALYSIS

### A.  Standard of Review

"Complaints alleging [False Claims Act] violations must comply with [Federal] Rule [of Civil Procedure] 9(b)'s requirement that fraud be pled with particularity because 'defendants accused of defrauding the federal government have the same protections as defendants sued for fraud in other contexts.'" *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011) (quoting *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003)).   "This Court reviews *de novo* a district court's dismissal of a complaint for failure to state a claim, including dismissal for failure to plead with particularity under [Rule] 9(b)." *United States ex rel. Eberhard v. Physicians Choice Lab. Servs., LLC*, 642 F. App'x 547, 550 (6th Cir. 2016) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.* ("*Bledsoe II*"), 501 F.3d 493, 502 (6th Cir. 2007)).   "In the *qui tam* context, 'the Court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible on its face.'" *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 502 (6th Cir. 2008) (quoting *Bledsoe II*, 501 F.3d at 502).

### B.  Presentation of False Claims for Payment – 31 U.S.C. § 3729(a)(1)(A)

Prather's main argument is that the Medicare claims that the defendants presented to the government for payment did not comply with the physician-certification and face-to-face documentation requirements mandated for such claims by the Medicare statute and regulations. This implicates 31 U.S.C. § 3729(a)(1)(A), which makes liable "any person who . . . knowingly

presents, or causes to be presented, a false or fraudulent claim for payment or approval." This provision "imposes liability when (1) a person presents, or causes to be presented, a claim for payment or approval; (2) the claim is false or fraudulent; and (3) the person's acts are undertaken 'knowingly,' i.e., with actual knowledge of the information, or with deliberate ignorance or reckless disregard for the truth or falsity of the claim." *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.* ("*Bledsoe I*"), 342 F.3d 634, 640 (6th Cir. 2003). The district court dismissed Prather's claim because (1) her legal theory for why the challenged claims were false or fraudulent was incorrect, and (2) she did not plead the presentment of specific requests for anticipated payment to the government. We disagree with both rulings.

### 1. Failure to Plead Falsity

The Supreme Court recently interpreted the False Claims Act's "false or fraudulent" language to "encompass[] claims that make fraudulent misrepresentations, which include certain misleading omissions." *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1999 (2016). Accordingly, "[w]hen . . . a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Id.* This theory of liability is known as "the implied false certification theory." *Id.* In this case, the alleged implied false certification arises because the defendants certified their compliance with Medicare regulations in submitting Medicare claims for payment, R. 73 (Second Amended Compl. ¶¶ 34–35) (Page ID #933), even though those very claims allegedly violated certain Medicare regulations.**2**

---

**2**The Supreme Court's decision in *Universal Health* had a second component, holding that an implied-false-certification claim may be brought only in relation to a misrepresentation regarding a legal or contractual violation that was "material to the other party's course of action," *Universal Health*, 136 S. Ct. at 2001, that such materiality will be found only if the misrepresentation "ha[s] a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property," *id.* at 2002 (quoting 31 U.S.C. § 3729(b)(4)), and therefore that the analysis whether a particular violation can be the basis for an implied-false-certification claim looks to the likely effect that knowledge of the misrepresentation would have had on the government's decision whether to pay, *id.* at 2003–04. The briefs in this case were filed before *Universal Health* was decided and the defendants did not press this issue on appeal, so we have no occasion to analyze the effect of *Universal Health* on our prior framework for analyzing whether an alleged misrepresentation could support an implied-false-certification claim, *see, e.g., United States ex rel. Augustine v. Century Health Servs., Inc.*, 289 F.3d 409, 415 (6th Cir. 2002), or the status of Prather's theories under the appropriate analysis.

The crux of this case is the viability of the legal theories on which Prather relies to allege that the defendants' Medicare claims were impliedly false. Although Prather suggests on appeal that her theory is that "rather than provide the [home-health] services pursuant to plans of care established by physicians, Defendants provided the services and then found physicians willing to retroactively validate them," Appellant Br. at 17, this does not match the factual allegations in her complaint, at least insofar as Rule 9(b)'s particularity requirement is concerned. The details that Prather alleged were that the physician certifications—that a face-to-face encounter with the patient had occurred, that home-health services were needed, and that a plan of care had been established and would govern the patient's care—were not *signed* until after the episode of care ended. *See* R. 73 (Second Amended Compl. ¶¶ 66, 90–95, 98, 102, 105) (Page ID #940, 947–49, 951–52). She therefore alleges that the doctors retroactively documented the circumstances under which the care was provided, but nowhere does she allege with the particularity required by Rule 9(b) that the doctors were lying. The issue is therefore whether the late physician signatures memorializing these certifications violated the applicable Medicare regulations. We begin with Prather's theory regarding requests for final payment, before assessing the requests for anticipated payment, and we ultimately conclude that Prather's allegations make out violations of Medicare regulations as to both types of claims.

### a. Requests for Final Payment

Medicare requires that a physician find that a patient requires certain services so that Medicare will not be billed for home-health care that was provided absent a medical need. As the United States suggested in its Statement of Interest before the district court, the physician-certification requirement "is not a backward-looking analysis of the medical necessity of *services performed* by a home health agency," but instead "is a forward-looking projection of *medical need*." R. 66 (Gov't Statement of Interest at 3) (Page ID #860). The statute's physician-certification requirements and the accompanying regulations implement this by specifying what a physician must do at the outset—meet face-to-face with the patient, find that home-health services are needed, and create and implement a plan of care. *See* 42 U.S.C. §§ 1395f(a)(2)(C), 1395n(a)(2)(A); 42 C.F.R. § 424.22(a)(1). This does not necessarily mean that the physician

must contemporaneously have signed and documented the fact that such matters occurred.**3** In fact, Medicare regulations declare that "[t]he certification of need for home health services must be obtained at the time the plan of care is established *or as soon thereafter as possible*," 42 C.F.R. § 424.22(a)(2) (emphasis added), and the government admitted below that this "provide[s] some leeway to providers in obtaining the certifying physician's signature," R. 66 (Gov't Statement of Interest at 3 n.1) (Page ID #860).

The murkiness in this case arises from the fact that "as soon thereafter as possible" is nowhere defined. We are therefore left to interpret the regulation's language. "As with all matters of regulatory interpretation, we look first to the plain and unambiguous meaning of the regulation, if any." *In re Arctic Express Inc.*, 636 F.3d 781, 791 (6th Cir. 2011) (quoting *Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Serv., Inc.*, 481 F.3d 337, 344 (6th Cir. 2007)). "If the terms of a regulation are ambiguous, '[w]e next look to the regulatory scheme, reading the regulation in its entirety to glean its meaning.'" *Id.* at 791–92 (quoting *Baptist Physician*, 481 F.3d at 344).

The regulation's use of the phrase "as soon thereafter as possible" suggests plainly that the analysis of whether a certification complies requires that the reason for any delay be examined. Otherwise, the regulation would have to provide a method for calculating the deadline—either by prescribing a number of days after the plan of care is established or supplying some other metric (e.g., the end of an episode of care). The only reasonable way to read the regulation, then, is that "as soon thereafter as possible" requires an examination of why it was not possible to complete the physician certification when the plan of care was established and whether that reason justifies the length of the delay. This is consistent with the ordinary meaning of the phrase "as soon as possible," as the Second Circuit held in a case involving a similar deadline in regulations implementing the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* In *D.D. ex rel. V.D. v. New York City Board of Education*, 465 F.3d 503, 514 (2d Cir. 2006), *op. amended in part by* 480 F.3d 138 (2d Cir. 2007), the regulatory

---

**3**Prather notes that the CMS form that is used to document such certifications presumes that the certification predates the provision of care (e.g., the physician certifies that the patient "is under my care"), R. 86-1 (CMS Form 485 at 2) (Page ID #1237), but the Medicare statute seems to contemplate that a certification may be documented after care has begun by also using the past tense to describe the certification (e.g., the physician must certify that home-health services "are or were required"). *See* 42 U.S.C. §§ 1395f(a)(2)(C), 1395n(a)(2)(A).

deadline for implementing a student's individualized education plan was "as soon as possible" after the plan is developed, and the Second Circuit interpreted that to impose "a flexible requirement":

> It permits some delay between when the [individualized education plan] is developed and when the [plan] is implemented. It does not impose a rigid, outside time frame for implementation. Moreover, the requirement necessitates a specific inquiry into the causes of the delay. Factors to be considered include, but are not limited to: (1) the length of the delay, (2) the reasons for the delay, including the availability of the mandated educational services, and (3) the steps taken to overcome whatever obstacles have delayed prompt implementation of the [plan]. Nonetheless, just because the as-soon-as-possible-requirement [sic] is flexible does not mean it lacks a breaking point.

*Id.* We interpret 42 C.F.R. § 424.22(a)(2) similarly. Certifications of need may be completed after the plan of care is established, but only if an analysis of the length of the delay, the reasons for it, and the home-health agency's efforts to overcome whatever obstacles arose suggests that the home-health agency obtained the certification "as soon thereafter as possible."**[4]**

The ordinary meaning of the phrase "as soon thereafter as possible" confirms this interpretation. No responsible litigant or attorney asked by a court during oral argument to submit a supplemental brief "by the end of the week or as soon thereafter as possible" would wait three months to do so. Nor would a patient accept a doctor's four-month delay if his doctor said that she would call him to discuss important test results "by next Tuesday, or as soon thereafter as possible." By its nature, the phrase suggests urgency. So too here. Nor is it surprising that such language would be used in this context. Doctors are busy, and they may see a large number of patients in a given year. Although it may be easy for a doctor to remember shortly after an appointment that she met with a particular patient on a particular day, found that the patient needed home-health services, and established a plan for providing those services to the patient, it likely would be much harder to remember this information months later. The deadline also makes it more difficult to defraud Medicare. Absent a deadline, a home-health

---

**[4]**This is consistent with the general principle embedded in the regulation governing physician certifications for other forms of health services. That provision—which appears in the same regulatory subpart as § 424.22, but does not purport to define "as soon thereafter as possible"—provides as a general "timeliness" rule that "[d]elayed certification and recertification statements are acceptable when there is a legitimate reason for delay," but that such "statements must include an explanation of the reasons for the delay." 42 C.F.R. § 424.11(d)(3).

agency might be able to provide unnecessary treatment absent a doctor's supervision and take the time to find doctors who are willing to validate that care retroactively. A deadline allowing only a short—and justified—delay between the beginning of care and the completion of the physician certification could make such a scheme difficult to pull off.

Although we find the regulation's meaning to be clear, we note that nothing in its regulatory or statutory context counsels otherwise. We can infer that the certification must be completed within one year because that is the deadline for requesting a final payment. *See* 42 C.F.R. § 424.44(a). And when the required face-to-face encounter between the doctor and patient occurs after the episode of care begins—it may occur "within 30 days of the start of the home health care," 42 C.F.R. § 424.22(a)(1)(v)—the certification of need may be completed at that time because it can be made only after the required face-to-face encounter occurs. *See* 42 U.S.C. § 1395f(a)(2)(C). The former adds nothing to our understanding of the meaning of "as soon thereafter as possible," while the latter may provide an example of a permissible justification for delay.[5]

The defendants' position is that the certification need not be completed until a final bill is submitted to Medicare, but they have never explained how "as soon thereafter as possible" could possibly be interpreted to mean "at any time within one year, regardless of the reason for delay." Nor are we persuaded by their focus on two guidance documents, which they suggest support the proposition that a certification of need may be obtained right before the submission of the final claim for payment. *See* R. 79-1 (2011 Medicare General Information, Eligibility, and Entitlement, Chapter 4 § 30.1) (Page ID #1088) ("The attending physician signs and dates the POC/certification prior to the claim being submitted for payment; rubber signature stamps are not acceptable."); CENTERS FOR MEDICARE & MEDICAID SERVICES, CERTIFYING PATIENTS FOR THE MEDICARE HOME HEALTH BENEFIT, https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms855a.pdf ("The certification must be complete prior to when [a home-health agency] bills Medicare for reimbursement."). Neither of these documents purport to

---

[5]The regulation's history does not provide any further clue to its meaning. The "as soon thereafter as possible" language comes from the original regulation that was promulgated in 1967, and the regulatory documents issued at the time do not shed light on the meaning of the phrase. *See* Notice of Proposed Rulemaking: Federal Health Insurance Program for the Aged Certification and Recertification, 32 Fed. Reg. 668, 670 (Jan. 4, 1967); Federal Health Insurance for the Aged Certification and Recertification, 32 Fed. Reg. 9537, 9539 (June 12, 1967).

interpret 42 C.F.R. § 424.22(a)(2) or to explain what "as soon thereafter as possible" means; rather, they merely observe that a final bill cannot be submitted to Medicare for payment absent the required documentation and certification. That does not mean that it is acceptable to wait until the last moment before a bill is submitted to obtain that certification.

We therefore hold that 42 C.F.R. § 424.22(a)(2) permits a home-health agency to complete a physician certification of need after the plan of care is established, but that such a delay will be acceptable only if the length of the delay is justified by the reasons the home-health agency provides for it.[6] Prather has alleged a violation of this regulation as far as the requests for final payment are concerned by asserting that the certifications were obtained months late due only to the fact that Brookdale had accumulated a large backlog of Medicare claims, which itself arose solely because of Brookdale's "aggressive solicitation" of its residents for Medicare-billable treatments that were not always medically necessary or did not need to be performed by nurses who billed to Medicare. *See* R. 73 (Second Amended Compl. ¶¶ 3, 57–63, 66, 90–105) (Page ID #925, 938–40, 946–52).[7] Accordingly, the allegations in the Second Amended Complaint suggest that the certifications were not obtained "as soon thereafter as possible" after

---

[6]We reject Prather's suggestion that the regulation sets a hard rule that certifications must be obtained by the end of the corresponding 60-day episode of care, although it may well be the rare excuse that could justify a delay beyond that timeframe. Prather relies on a sentence that was added to the 2015 Medicare Benefit Policy Manual:

> The certification must be complete prior to when [a home-health agency] bills Medicare for reimbursement; however, physicians should complete the certification when the plan of care is established, or as soon as possible thereafter. This is longstanding CMS policy as referenced in Pub. 100-01, Medicare General Information, Eligibility, and Entitlement Manual, chapter 4, section 30.1. *It is not acceptable for [home-health agencies] to wait until the end of a 60-day episode of care to obtain a completed certification/recertification.*

R. 86-2 (2015 Medicare Benefit Policy Manual § 30.5.1) (Page ID #1270) (emphasis added). It is uncontroversial to suggest that the certification should be completed "when the plan of care is established, or as soon as possible thereafter," *id.*, as that is what 42 C.F.R. § 424.22(a)(2) requires. Furthermore, the referenced Medicare Manual supports the statement that this is "longstanding CMS policy." *See* R. 79-1 (2011 Medicare General Information, Eligibility, and Entitlement, Chapter 4 § 30.1) (Page ID #1088). But the highlighted sentence suggests that completing the certification after the end of an episode of care is "not acceptable," which appears to be a novel rule that the 2015 Manual does not support by reference to any legal source—the prior version of the same manual contained no such language. *See* R. 58-1 (2014 Medicare Benefit Policy Manual § 30.5.1) (Page ID #377–78). Just as we reject the defendants' attempt to read a hard deadline where the regulation uses the flexible "as soon thereafter as possible" language, we also reject Prather's attempt to do the same.

[7]Although Prather disclaimed any reliance on an independent claim regarding the medical necessity of care that was provided, R. 85 (Opp'n to Mot. to Dismiss at 22–23) (Page ID #1151–52), these factual allegations remain relevant to our analysis of the alleged fraudulent scheme regarding physician certifications.

each patient's plan of care was established, making the requests for final payment impliedly false.[8]

### b. Requests for Anticipated Payment

Although requests for anticipated payments are a regulatory invention that constitute "claims" for purposes of the False Claims Act, but are "not a Medicare claim for purposes of the [Medicare] Act," 42 C.F.R. § 409.43(c)(2), they are treated similarly to requests for final payment. The certifications are made a condition of Medicare payment, in a provision that does not distinguish between requests for final payment and requests for anticipated payment. *See* 42 C.F.R. § 424.10(a). And the portion of the statute that created the prospective-payment system under which requests for anticipated payment are authorized did not "waiv[e] the requirement for a physician certification under section 1395f(a)(2)(C) or 1395n(a)(2)(A) . . . for the payment for home health services." 42 U.S.C. § 1395fff(e)(2). Those sections implement Congress's directive that payment for home-health services requires compliance with the aforementioned physician-certification requirements—i.e. the certification that (1) the services were needed; (2) a plan of care was established; (3) the services were furnished under the care of a doctor; and (4) that the face-to-face encounter occurred. *See* 42 U.S.C. §§ 1395f(a)(2)(C), 1395n(a)(2)(A). Thus, the same certification requirements apply to requests for anticipated payment that apply to requests for final payment.

Brookdale seeks to avoid this result by referring to a different portion of the Medicare regulations. But that portion reiterates that "[i]n order for home health services to qualify for payment under the Medicare program the following requirements must be met: . . . (b) [t]he physician certification and recertification requirements for home health services described in § 424.22." 42 C.F.R. § 409.41. Thus, the same certification requirement—and the same timing

---

[8]The dispute regarding the face-to-face encounter documentation follows the same analysis. The statute suggests that face-to-face encounters must be "document[ed]" at a time "prior to making [the physician certification of need for care]." 42 U.S.C. §§ 1395f(a)(2)(C), 1395n(a)(2)(A). Regulations clarify that the face-to-face encounter must have "occurred no more than 90 days prior to the home health start of care date or within 30 days of the start of the home health care." 42 C.F.R. § 424.22(a)(1)(v). Prather does not allege that the encounters occurred outside this range, only that the certifications documenting those encounters were made much later. Because the regulation requires an analysis of the reason for any delay and Prather has alleged that the delay was due to a backlog of Medicare claims created due to the defendants' aggressive solicitation of residents for Medicare-qualified services, this aspect of the claim properly alleges falsity as to the requests for final payment.

requirement for that certification—is applied by the regulatory subpart on which Brookdale relies. The regulation adds that additional "requirements contained in §§ 409.42 through 409.47" must also be met, 42 C.F.R. § 409.41(c), and Brookdale focuses on one of those additional requirements—42 C.F.R. § 409.43, which imposes different requirements regarding the physician's obligation to sign a patient's *plan of care*. For requests for final payments, "[t]he plan of care must be signed and dated . . . . [b]efore the claim for each episode for services is submitted for the final percentage prospective payment." 42 C.F.R. § 409.43(c)(3). A "physician signed plan of care" is not required when a request for anticipated payment is submitted, however, as long as the request is "based on . . . [a] physician's verbal order." 42 C.F.R. § 409.43(c)(1). Contrary to the defendants' assumption, however, this regulation has no bearing on the physician's separate obligation to make the certifications detailed in 42 C.F.R. § 424.22(a). Section 409.43 thus suggests only that it cannot be a separate violation of Medicare regulations for a request for anticipated payment to be submitted before a *plan of care* is signed, so long as the appropriate verbal order or referral has been secured.[9]

Requests for anticipated payment remain subject to the "forward-looking projection of medical need at the time the beneficiary's plan of care is established prior to the start of the episode." R. 66 (Gov't Statement of Interest at 3) (Page ID #860) (emphasis omitted). Given that they occur earlier in the process, the impact of the certification regulation on requests for anticipated payment is by necessity more flexible. For example, a physician certification of need may at times be obtained 30 days after an episode of care begins because the face-to-face encounter may occur "within 30 days of the start of the home health care," 42 C.F.R. § 424.22(a)(1)(v), but the certification of need may not be completed until that face-to-face encounter occurs, 42 U.S.C. § 1395f(a)(2)(C). At bottom, however, the requirement that a

---

[9]Prather appears to pursue a separate legal theory that the requests for anticipated payment failed to comply with this regulation. She alleged that, for Patients A and B, "there was no properly attested verbal order from the physician to start care." R. 73 (Second Amended Compl. ¶¶ 91, 93) (Page ID #947–48). We presume that this refers to the attestation requirement of 42 C.F.R. § 409.43(c)(1)(C), which mandates that the doctor's verbal order be documented in the plan of care and "[]include[] an attestation (relating to the physician's orders and the date received) signed and dated by the registered nurse or qualified therapist . . . responsible for furnishing or supervising the ordered service in the plan of care." Prather does not further detail this allegation—neither explaining what about the attestations was improper, nor alleging that the same issue arose with respect to any other patient or even that such deficiencies were part of the overall fraudulent scheme. We therefore find that this theory was inadequately pleaded under Federal Rule of Civil Procedure 9(b).

certification of need be obtained at the time the plan of care is established or "as soon thereafter as possible" applies equally to requests for anticipated payment.

Prather's theory regarding the requests for anticipated payment is therefore largely the same as her theory about the requests for final payment—the physician certification of need was required to "be obtained at the time the plan of care is established or as soon thereafter as possible," 42 C.F.R. § 424.22(a)(2), but the defendants delayed for little reason. We find Prather's allegations to be sufficient, as we did for the requests for final payment. Although the requests for anticipated payment were submitted earlier—the four exemplar patients described by Prather each had requests submitted on or about the start of their episode of care, R. 73 (Second Amended Compl. ¶¶ 90–93, 95–98) (Page ID #947–49)—Prather's allegations remain largely the same: The certification of need was not obtained at the time the patient's plan of care was established, and the only reason for the delay was the defendants' overly aggressive application of Medicare-billable care to residents of their senior-living facilities and the corresponding bureaucratic backlog that arose from it. *See id.* ¶¶ 3, 57–63, 66 (Page ID #925, 938–40).

\*        \*        \*

We hold that Prather pleaded legal falsity regarding both the requests for anticipated payment and the requests for final payment. Because that was the defendants' only argument regarding the requests for final payment, this is sufficient to revive that portion of Prather's claim. As for the requests for anticipated payment, we now turn to the defendants' additional argument that Prather failed to plead the presentment element regarding those claims.

### 2. Failure to Plead Presentment of Requests for Anticipated Payment

A claim under 31 U.S.C. § 3729(a)(1)(A) "requires proof that the alleged false or fraudulent claim was 'presented' to the government." *United States ex rel. Marlar v. BWXT Y-12, LLC*, 525 F.3d 439, 445 (6th Cir. 2008). At the pleading stage, we have interpreted this requirement stringently: "[W]here a relator alleges a 'complex and far-reaching fraudulent scheme,' in violation of § 3729(a)(1), it is insufficient to simply plead the scheme; [s]he must also identify a representative false claim that was actually submitted to the government."

*Chesbrough*, 655 F.3d at 470 (quoting *Bledsoe II*, 501 F.3d at 510).  The theory behind this requirement is that "[t]he False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *Sanderson v. HCA—The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir.) (quoting *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002)), *cert. denied*, 549 U.S. 889 (2006).  "Although the relator does not need to identify *every* false claim submitted for payment, [s]he must identify with specificity 'characteristic examples that are illustrative of the class of all claims covered by the fraudulent scheme.'"  *Chesbrough*, 655 F.3d at 470 (quoting *Bledsoe II*, 501 F.3d at 511); *see also Bledsoe II*, 501 F.3d at 509 ("Where the allegations in a relator's complaint are 'complex and far-reaching, pleading every instance of fraud would be extremely ungainly, if not impossible." (quoting *United States ex rel. Franklin v. Parke–Davis, Div. of Warner–Lambert Co.*, 147 F. Supp. 2d 39, 49 (D. Mass. 2001))).  Thus, "where a relator pleads a complex and far-reaching fraudulent scheme with particularity, and provides examples of specific false claims submitted to the government pursuant to that scheme, a relator may proceed to discovery on the entire fraudulent scheme." *Bledsoe II*, 501 F.3d at 510.

The district court held that Prather's allegations regarding specific requests for anticipated payment fell short of this standard.  In the district court's view, the defect was Prather's failure to allege:

> (1) the basis of any patient's [request for anticipated payment], (2) the billing date of any patient's [request for anticipated payment] submission (which is not (nor alleged to be) the same as a treatment begin or end date), (3) the form or method used to submit any [request for anticipated payment], (4) any corporate authorization for any [request for anticipated payment], (5) any amount requested/billed in any [request for anticipated payment], or (6) any amount paid to the defendants by the government in response to any [request for anticipated payment].

R. 89 (Nov. 5, 2015 Op. at 30) (Page ID #1387) (footnote omitted).

Although Prather alleged significant detail regarding the fraudulent scheme, her involvement in reviewing patient documentation for submission for Medicare payment, and the

details of the alleged deficiencies in the documentation that she reviewed about specific patients, the district court was correct that Prather did not allege information regarding the key fact that our cases have identified: The actual *submission* of a *specific* request for anticipated payment to the government. We have demanded as much, even in cases involving allegations of a detailed fraudulent scheme. *See, e.g., SNAPP*, 532 F.3d at 505–06 (allegations that fraudulent misrepresentations regarding Ford Motor Company's use of small businesses "owned and controlled by socially and economically disadvantaged individuals" were made in reports filed with the government—in connection with a government program promoting the use of such small businesses—was insufficient to prove presentment where the relator also alleged that "Ford entered into a large, undetermined number of contracts with the federal government" because the relator did not identify a specific claim submitted to the government); *Marlar*, 525 F.3d at 442, 445–46 (allegation that a nuclear-power facility that contracted with the Department of Energy "engaged in 'systematic and significant underreporting of work-related injuries and illnesses and time missed from work,'" and did so "to inflate its performance-based compensation under the [Department of Energy] contract," was insufficient where relator's knowledge was only that allegedly undercounting reports "left her division" and she relied on allegations "on information and belief" that they had been provided to senior management officials and ultimately made their way onto forms provided to the Department of Energy). Accordingly, the district court correctly held that Prather did not sufficiently allege the submission of particular requests for anticipated payment to the government.

Although we have repeatedly applied this heightened pleading standard, we have also hypothesized that "the requirement that a relator identify an actual false claim may be relaxed when, even though the relator is unable to produce an actual billing or invoice, he or she has pled facts which support a strong inference that a claim was submitted." *Chesbrough*, 655 F.3d at 471. Prather asks us to apply this exception. To be sure, "we have yet to apply a relaxed Rule 9(b) standard in practice," *Eberhard*, 642 F. App'x at 551, but that is because previous cases invoking it involved facts that did not warrant its application. These cases have suggested that the exception could be applied when a relator alleges specific personal knowledge that relates directly to billing practices. *See Chesbrough*, 655 F.3d at 471. This could include "personal knowledge that the claims were submitted by Defendants . . . for payment" or other "personal

knowledge of billing practices or contracts with the government," *id.* at 471–72 (internal quotation marks omitted), as well as "'personal knowledge' that was based either on working in the defendants' billing departments, or on discussions with employees directly responsible for submitting claims to the government," *United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 413 (6th Cir. 2016).

Prather's allegations satisfy this threshold. They provide a detailed overview of the alleged fraudulent scheme, and, when accepted as true, it is difficult to deny the strong inference that the specific requests for anticipated payment that Prather identified and described were submitted. Prather provided information about the treatment of Patients A–D, as well as the patients identified in Exhibits A & B to her Second Amended Complaint. For Patients A–D, she identified approximately the dates of the applicable episode of care and the dates on which the physician certification of need and face-to-face documentation were signed, alleged that requests for anticipated payment and for final payment were submitted (sometimes giving dates of submission for one or both), and identified the amount that was requested for the final payment. *See* R. 73 (Second Amended Compl. ¶¶ 90, 92–96, 98) (Page ID #946–49). For the hundreds of patients listed in Exhibits A & B, Prather provided the start and end dates for the treatment episode, along with identifying information for the specific provider of home-health services and the specific Brookdale community in which the patient resided, R. 73-1 (Ex. A to Second Amended Compl.) (Page ID #958–81); R. 73-2 (Ex. B to Second Amended Compl.) (Page ID #982–1015), and alleged that a request for anticipated payment was submitted to Medicare for each, *see* R. 73 (Second Amended Compl. ¶¶ 102, 105) (Page ID #951–52).

These allegations must also be viewed in context. Prather was hired to work on the Held Claims Project—a project devoted to working through a backlog of Medicare claims, R. 73 (Second Amended Compl. ¶¶ 63–67) (Page ID #940–41)—and her responsibilities were focused on reviewing the documentation for those Medicare claims, *in anticipation of them being submitted to Medicare*. *Id.* ¶¶ 69, 71, 75–80 (Page ID #941–44). Prather also received confirmation that the final claims that she reviewed were submitted for payment. She and other employees received an email from Diana Sharp—an Innovative Senior Care employee who "headed up the group of temporary employees" hired for the Held Claims Project, *id.* ¶ 74 (Page

ID #942)—"gleefully reporting: '[we] have processed and released over **10,000** claims since 2/7!!'" *Id.* ¶ 88 (Page ID #946) (emphasis in original). And "[d]efendants issued weekly reports, called the 'Home Health Held Claims Report,' that showed how many claims were being held and how many claims had been released for billing to Medicare." *Id.* ¶ 68 (Page ID #941)).

Even though Prather was reviewing final claims for submission, *id.* ¶¶ 91, 93, 96–98 (Page ID #947–49), her knowledge of their submission and documentation supports a strong inference that requests for anticipated payment were submitted for each patient whose final claim Prather reviewed. This is because the entire held-claims project existed to avoid the "looming financial crisis" created by those held claims, *id.* ¶ 86 (Page ID #945), which was a product of the fact that if those claims were not submitted for final payment, the defendants would have faced the recoupment of anticipated payments that had been made regarding the same episode of care, *see* 42 C.F.R. § 409.43(c)(2). Prather's detailed knowledge of the billing and treatment documentation related to the submission of requests for final payment, combined with her specific allegations regarding requests for anticipated payment, also creates a strong connection between the requests for anticipated payment and the requests for final payment. Prather further alleged that requests for anticipated payment were submitted. R. 73 (Second Amended Compl. ¶¶ 91–93, 96–98, 100–05) (Page ID #947–52). Accepting all of these allegations as true, we cannot deny the strong inference that the specific documentation that Prather reviewed related to patients for whom requests for anticipated payment had been submitted to the government for payment.

Our decisions rejecting application of the exception have not involved this level of detail regarding: (1) specific identified claims for payment that (2) the relator reviewed for billing-related purposes. *See, e.g.*, *Sheldon*, 816 F.3d at 403, 414 (relator alleging that a health-care network falsely certified "that it implemented a system of protecting electronic protected health information"—in connection with a law providing "incentive payments" for providers "that demonstrate 'meaningful use of' electronic-health-record technology—pleaded no knowledge of the defendant's "security or billing departments, [n]or that she ever spoke with those directly responsible for [the] certification"); *Chesbrough*, 655 F.3d at 464–65, 471–72 (relators were contractors who agreed "to interpret [radiological] images created by [the defendant's]

technologists," had agreed to have "no involvement with billing procedures of Medicare," and alleged that "the images . . . were often of poor quality or defective," but they could not take advantage of the relaxed pleading standard because they "lack[ed] . . . personal knowledge of billing practices or contracts" and "[t]he mere existence of a few allegedly 'nondiagnostic' tests does not support a strong inference that claims for those tests were submitted to the government"). Accordingly, Prather pleaded facts supporting the application of the exception.

Although we have consistently suggested that the exception would apply in similar circumstances, we have never formally applied it. We therefore explain briefly why it is a necessary component of our pleading standard for False Claims Act cases, without which our jurisprudence would exceed the requirements of Federal Rule of Civil Procedure 9(b) and improperly undermine the False Claims Act.

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "When Rule 9(b) applies to a complaint, a plaintiff is not expected to actually *prove* his allegations." *Clausen*, 290 F.3d at 1313. But the Rule does heighten the pleading standard. Rule 9(b)'s "particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *Id.* at 1310 (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)). Neither concern supports the dismissal of cases filed by those who can otherwise allege facts—based on personal knowledge of billing practices— supporting a strong inference that particular identified claims were submitted to the government for payment. Requiring a relator to plead with particularity the details of specific claims submitted to the government for payment in these circumstances would provide no further notice to a defendant of the charged wrongdoing, and the concern for warding off frivolous claims is already served by requiring detailed personal knowledge of billing practices and specific identified claims.

Requiring such specifics in circumstances like Prather's would also distort the normal rules of pleading under Rule 9(b), serving only to "reintroduce formalities to pleading." *Bledsoe II*, 501 F.3d at 503. But "the purpose of Rule 9 is . . . to provide defendants with a more specific

form of notice as to the particulars of their alleged misconduct." *Id.* Although conjecture and speculation are insufficient under Rule 9(b), we must "construe the complaint in the light most favorable to the plaintiff [and] accept all factual allegations as true." *SNAPP*, 532 F.3d at 502 (quoting *Bledsoe II*, 501 F.3d at 502). Under those rules, Prather's allegations of personal knowledge of a detailed fraudulent scheme, including identification—based on her experience with billing-related matters—of specific false claims within that scheme and facts supporting a strong inference that those specific claims were submitted to the government for payment cannot be said to be improper conjecture. Indeed, it could be said to be conjecture "only if we were willing to attribute to [the defendants] a highly unusual business model," *Clausen*, 290 F.3d at 1317 (Barkett, J., dissenting), in which Prather and others were hired for a year-long project reviewing final Medicare claims in an attempt to avoid the recoupment of anticipated payments that were previously obtained, when in fact the defendants had never actually requested or received those anticipated payments.

Furthermore, such a rule would undermine the effectiveness of the False Claims Act. As the United States has suggested in an amicus brief regarding an ultimately unsuccessful petition for a writ of certiorari on this issue:

> *Qui tam* complaints are often filed by the defendants' current and former employees. Such relators may be privy to detailed information indicating that their employers are engaged in fraud against the United States, and may be well-positioned to provide valuable assistance to the government's anti-fraud efforts, even if they are not privy to the details of the defendants' billing activities.

Br. for the United States as Amicus Curiae at 15, *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 2014 WL 709660 (Feb. 25, 2014) (No. 12-1349). Although we require such details in the majority of False Claims Act cases, our consistent admonition that the rule could be relaxed for those like Prather who not only plead facts supporting a strong inference that claims were submitted, but do so while identifying the particular claims based on their own personal knowledge of billing-related practices, assuages this concern to some extent. Accordingly, we were right to hypothesize that an exception to the heightened pleading standard should exist, and we confirm our adoption of that exception today.

In doing so, we recognize that most other circuits have applied either an across-the-board heightened standard or an across-the-board permissive one.[10] This split is not nearly as deep as it first appears, however. Every circuit that has applied a heightened standard, save ours, has retreated from such a requirement in cases in which other detailed factual allegations support a strong inference that claims were submitted. *See United States ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 917–18 (8th Cir. 2014) (adopting a standard that "that a relator can satisfy Rule 9(b) by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted" (internal quotation marks omitted)); *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1172 (10th Cir. 2010) (relator "need only . . . provide an adequate basis for a reasonable inference that false claims were submitted"); *United States ex rel. Walker v. R & F Props. of Lake Cty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) (allowing a claim to proceed in the absence of specific allegations regarding particular Medicare claims), *cert. denied*, 549 U.S. 1027 (2006). Our hypothesis that an exception might exist for cases raising similar circumstances codifies a similar recognition. Furthermore, our formal adoption of a doctrine that (1) requires the pleading of representative false claims in the majority of cases, while (2) recognizing that a relator may nonetheless survive a motion to dismiss by pleading specific facts based on her personal billing-related knowledge that support a strong inference that specific false claims were submitted for payment is broadly consistent with the approach adopted by the Fourth Circuit. Like us, the Fourth Circuit agrees with the more stringent side of the circuit split,

---

[10]*Compare Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998–99 (9th Cir.) (allowing claims based on allegations of "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted" (internal quotation marks omitted)), *cert. denied*, 562 U.S. 1102 (2010), *and United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 126 (D.C. Cir. 2015) (same), *cert. denied*, No. 15-363, 2016 WL 3461577 (U.S. June 27, 2016), *and Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155–56 (3d Cir. 2014) (same), *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190–91 (5th Cir. 2009) (same), *and United States ex rel. Duxbury v. Ortho Biotech Prods. L.P.*, 579 F.3d 13, 29 (1st Cir. 2009) (holding that, in actions "in which the defendant induced *third parties* to file false claims with the government," it was not necessary to "provid[e] details as to each false claim" if there were "factual or statistical evidence to strengthen the inference of fraud beyond possibility"), *cert. denied*, 561 U.S. 1005 (2010), *and United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854–55 (7th Cir. 2009) ("It is enough to show, in detail, the nature of the charge, so that vague and unsubstantiated accusations of fraud do not lead to costly discovery and public obloquy."), *with United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557 (8th Cir.) (requiring detailed allegations regarding a specific representative false claim that was submitted to the government for payment), *cert. denied*, 549 U.S. 881 (2006), *and United States ex rel. Sikkenga v. Regence BlueCross BlueShield of Utah*, 472 F.3d 702, 727 (10th Cir. 2006) (same), *and Clausen*, 290 F.3d 1301 (same).

explaining "that when a defendant's actions, as alleged and as reasonably inferred from the allegations *could* have led, but *need not necessarily* have led, to the submission of false claims, a relator must allege with particularity that specific false claims actually were presented to the government for payment." *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 457 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 1759 (2014). This approach, the Fourth Circuit emphasized, is not inconsistent with the many cases on the more permissive side, which often involved "specific allegations of the defendant's fraudulent conduct necessarily led to the plausible inference that false claims were presented to the government," a situation the Fourth Circuit recognized might warrant surviving a motion to dismiss. *Id.*

## C.  Use of False Records – 31 U.S.C. § 3729(a)(1)(B)

Prather's second claim is that the same payment requests at issue in her first claim also involved the submission of false records to the government in violation of 31 U.S.C. § 3729(a)(1)(B), which makes liable "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." The district court dismissed this claim in part because it is based on the same alleged false claims as the claim discussed in Part II.B, *supra*, and "Prather fails to adequately identify any false or fraudulent claim." R. 89 (Nov. 5, 2015 Op. at 42) (Page ID #1399). Because we have rejected this argument, it is not a sufficient basis to dismiss the claim. The district court also dismissed Prather's false-records claim upon finding that Prather did not "allege any particular facts regarding" the false statements at issue. *Id.* In so doing, the district court rejected Prather's arguments to the contrary. We agree with the district court.

*First*, the district court found that Prather failed to allege anything to support the argument that the false statements came when physicians signed CMS Form 485s documenting the required physician certifications, which contain "prospective language" signifying that the physician was signing before the treatment commenced, but were signed after an episode of care ended. *Id.* Prather suggests that the forms submitted by the defendants to the government "were false because they purport to certify care as medically necessary from the outset of the episode and are forward-looking, but Defendants instead used the prospective language on the form to certify claims for patients that had already been discharged." Appellant Br. at 40. To the extent

that this theory is that the documents falsely certified that care had been provided pursuant to a physician's orders, when a doctor was retroactively validating improperly provided care, that theory is not stated with particularity in the Second Amended Complaint. *See supra* at 13. If Prather is merely stating that the form's language indicated that a certification was being signed before care was provided when the act of signing in fact came after care had begun, the fact that the statute and regulations clearly contemplate that this may be permissible renders an argument that the forms were "false" unconvincing. *See supra* at 14 n.3.

*Second*, the district court rejected any false-record claim based upon the submission of forms for which "the primary diagnosis justifying home health care billing to Medicare was inconsistent with the care actually provided to the patient" because those allegations did not set forth "specific false statements" and instead stated "conclusory judgments about the nature of the care needed by patients based on Prather's subjective judgment." R. 89 (Nov. 5, 2015 Op. at 42–43) (Page ID #1399–1400). On appeal, Prather emphasizes that the forms submitted for Patients A and C did not correlate to their diagnosis or the treatment they received. *See* Appellant Br. at 40. As explained previously, Prather disclaimed any legal theory based upon the provision by defendants of medically unnecessary treatment. *See supra* at 8 n.1. In any event, Prather did not plead with particularity any facts suggesting that the diagnoses and treatment submitted to the government were false, relying exclusively on conclusory statements regarding Patients A and C. *See* R. 73 (Second Amended Compl. ¶¶ 90, 95) (Page ID #946, 948). Accordingly, we **AFFIRM** the dismissal of the false-records claim.

## D. Reverse False Claim – 31 U.S.C. § 3729(a)(1)(G)

Prather's final claim is that the defendants wrongly retained anticipated payments to which they were not entitled due to the regulatory violations discussed previously. The reverse-false-claims provision of the False Claims Act makes liable "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). An obligation includes "the retention of any overpayment," 31 U.S.C. § 3729(b)(3), and the current version of the statute makes clear that

"there is no longer a need to show the affirmative use of a false record or statement in connection to the avoidance of an obligation to pay money to the United States," R. 66 (Gov't Statement of Interest at 6–7) (Page ID #863–64), so the knowing retention of an overpayment is enough.

The Second Amended Complaint alleges that the defendants "knew that they had been overpaid by Medicare, but did not take the required and appropriate steps to satisfy the obligation owed to the United States" in connection with the allegedly improper requests for anticipated payment. *See* R. 73 (Second Amended Compl. ¶ 121) (Page ID #955). The district court dismissed this claim solely because Prather had failed properly to plead the presentment of any request for anticipated payment, R. 89 (Nov. 5, 2015 Op. at 43) (Page ID #1400), and the defendants assert this argument, *see* Appellee Br. at 40–41. Because this argument is identical to that made in connection with Prather's claim regarding the submission of false Medicare claims for payment, we reject it for the same reasons. *See supra* Part II.B. On appeal, the defendants also argue that Prather failed to plead that any of the requests for anticipated payment were false or fraudulent. *See* Appellee Br. at 40–41. As Prather notes, this argument may be rejected for the reason discussed in connection with her other claim—she pleaded legal falsity with respect to the requests for anticipated payment because they, too, were not certified "as soon thereafter as possible."[11] Accordingly, we **REVERSE** the dismissal of Prather's reverse-false-claim cause of action.

### III.  CONCLUSION

For the foregoing reasons, we **REVERSE** the dismissal of Prather's claims regarding the submission of false or fraudulent claims for payment and the fraudulent retention of payments, and we **AFFIRM** the dismissal of Prather's claim regarding the use of false records.

---

[11]We therefore need not reach Prather's argument that even if the initial submission of the requests for anticipated payment was not problematic, the defendants' retention of those anticipated payments after the final payment requests were submitted in violation of the regulations triggered a recoupment obligation. Appellant Br. at 41; *cf.* 42 C.F.R. § 409.43(c)(2) (recognizing the government's "authority to reduce or disapprove requests for anticipated payments in situations when protecting Medicare program integrity warrants this action" and stating that "the request for anticipated payment will be canceled and recovered unless the claim is submitted within the greater of 60 days from the end of the episode or 60 days from the issuance of the request for anticipated payment.").

———————————————————————————————

**CONCURRING IN PART AND DISSENTING IN PART**

———————————————————————————————

McKEAGUE, Circuit Judge, concurring in part and dissenting in part. Marjorie Prather sued defendants for allegedly violating the False Claims Act. One violates the Act by presenting false claims for payment to the federal government. Yet Prather's complaint does not allege that defendants presented any claims to Medicare that were actually *false*. In fact, the majority concedes that Prather's theory of the case—that defendants treated patients without supervision and only later found doctors willing to lie on the paperwork about their involvement—is not alleged with sufficient particularity in her complaint. For the majority, this defect requires the dismissal only of Prather's false-records claims. It should, however, be fatal to Prather's entire case.

Instead, the majority improvises a way to salvage Prather's other claims related to defendants' requests for final payment and requests for anticipated payment. First, the majority fashions its own Medicare rule: home health agencies must have doctors sign certifications and face-to-face documentation before starting care or provide a valid excuse for not doing so. Even after the majority creates this valid-excuse requirement and decides defendants violated it, Prather's request-for-anticipated-payment claims are still not safe—Prather never pleaded with particularity, as Rule 9(b) demands, that defendants presented these requests to Medicare. So the majority also decides that we should apply an exception to Rule 9(b) for Prather—a first in this circuit. Because the majority's conclusion that Prather pleaded falsity is inconsistent with Medicare regulations and CMS guidance, and because this is not an appropriate case to relax Rule 9(b), I respectfully dissent.

**I**

Defendants sent Medicare two different types of requests: (1) requests for final payments and (2) requests for anticipated payments. *See* Maj. Op. at 5. Prather argues that the falsity in both types stems from defendants' failure to comply with certain Medicare regulations. When defendants submitted these claims for payment, they warranted that they abided by Medicare's

rules.  Thus, if defendants actually violated the applicable regulations, then any submitted claims were false.

The supposed violations for both types of requests are essentially the same, but it is worth distinguishing them because additional regulatory guidance makes Prather's arguments even weaker with respect to anticipated-payment requests.  So although the following analysis discusses only requests for final payments, it applies with equal force to requests for anticipated payments. Similarly, Prather's two theories of how defendants broke the Medicare rules—that doctors (1) did not sign certifications regarding patients' need for home health services when patients' plans of care were established or "as soon thereafter as possible"; and (2) also did not sign documentation regarding face-to-face encounters with patients in a timely enough manner— require an identical analysis.  *See* Maj. Op. at 24, n.8.  Thus, even though I discuss only the certifications of need for home health services, this discussion also applies to the face-to-face documentation.

For Medicare to pay for home health services, a physician must certify that patients meet certain eligibility requirements.  42 C.F.R. § 424.22.  Specifically, the physician must certify that (1) home health services "are or were required"; (2) a plan of care has been established and is periodically reviewed by a physician; (3) the services "are or were furnished while the individual is or was under the care of a physician"; and (4) "prior to making such certification the physician must document that the physician . . . has had a face-to-face encounter . . . with the individual during the 6-month period preceding such certification."  42 U.S.C. § 1395n(a)(2)(A); *see also* 42 U.S.C. § 1395f(a)(2)(C).  Medicare will only pay a claim submitted with a completed certification.  42 C.F.R. § 424.10(a).

The regulations do not prescribe an exact timeframe for the physicians to complete a certification.  Instead, they provide that "[t]he certification of need for home health services must be obtained at the time the plan of care is established or *as soon thereafter as possible*." 42 C.F.R. § 424.22(a)(2) (emphasis added).  Although the government indicates in its statement of interest that a certification "is not a backward-looking analysis of the medical necessity of services performed," but "is a forward-looking projection of medical need," it also recognizes that the regulations "provide some leeway to providers in obtaining the certifying physician's

signature."  R. 66, Gov't Statement of Interest at 3 & n.1, Page ID 860.  This case, as the majority recognizes, turns on the phrase "as soon thereafter as possible."

Medicare regulations leave "as soon thereafter as possible" undefined.  But the regulations do provide some information about the deadline for certifications.  We know that a certification must be completed within one year, because home health agencies must submit claims for final payment within one year.  *See* 42 C.F.R. § 424.44(a).  We also know that face-to-face encounters must occur *before* certification, 42 U.S.C. § 1395n(a)(2)(A), and that these encounters may occur "within 30 days of the start of the home health care."  42 C.F.R. § 424.22(a)(1)(v).  The rules also make it clear that a certification may be completed *after* services are provided, because the physician must certify that home health services "are *or were* required" and that services "are *or were* furnished while the individual is or was under the care of a physician."  42 U.S.C. § 1395n(a)(2)(A) (emphasis added).  So, in sum, we know that a certification must be completed within one year and may occur (1) when the plan of care is established; (2) at some point after the face-to-face encounter, which can occur up to 30 days after care begins; or (3) at some point after care ends.

Given the flexibility apparent in this scheme, defendants argue that a certification has only one real deadline: it has to be completed at a point prior to submitting a final claim for payment—that is, within one year. Defendants point to guidance from CMS and other Medicare-related organizations to support their position.  The Medicare General Information, Entitlement, and Eligibility Manual states that "the attending physician [must] sign[] and date[] the POC/certification *prior to the claim being submitted for payment*."  Medicare Manual, CMS Pub. 100-01, Ch. 4, § 30.1 (April 2011) (emphasis added).  In 2013, in collaboration with CMS and the Medicare Learning Network, the American Medical Association published advisory guidance stating the same requirement.  *See* Medicare Learning Network, MLN Matters Article SE1436 at 4, *available at* https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/downloads/SE1436.pdf ("According to the regulations . . . physicians should complete the certification when the plan of care is established or as soon as possible thereafter.  *The certification <u>must</u> be complete prior to when an HHA bills Medicare for reimbursement*.") (emphasis added).  Contractors who are under CMS supervision and must

comply with Medicare billing rules have issued similar guidance. *See, e.g.*, Ask-the-Contractor Questions and Answers, June 21, 2015 at No. 5, *available at* https://www.cgsmedicare.com/hhh/education/faqs/act/act_qa062415.html (citing the Medicare Manual and the MLN article) ("The physician certification must be signed before the final claim is submitted.").

Prather offers little to challenge defendants' interpretation. She relies on a 2015 Medicare Benefit Policy Manual which suggests that "[i]t is not acceptable for [home health agencies] to wait until the end of a 60-day episode of care to obtain a completed certification/recertification." R. 86-2, 2015 Medicare Benefit Policy Manual § 30.5.1, Page ID 1270. But her reliance on this manual is unpersuasive for two reasons. First, it was issued in 2015, and thus could not establish that defendants were required *in 2010 and 2011* to obtain certifications before care had ended.[1] Second, the 2015 Manual's language is inconsistent with the statute, which clearly contemplates that physicians may complete certifications *after* care has been provided. *See* 42 U.S.C. § 1395n(a)(2)(A) (providing that physicians must certify that services "are *or were* required" and that services "are *or were* furnished") (emphasis added).

Given this regulatory scheme and the CMS guidance supporting defendants' position, I am persuaded that, at the time defendants' conduct occurred, Medicare regulations allowed defendants to obtain doctors' certifications so long as they were completed before final claims were submitted. If CMS intended something different, it would have defined "as soon thereafter as possible" in the regulations or clarified the deadline in its guidance. It did not, and Prather has not provided a single instance where Medicare determined that certifications were obtained "too late" because they were not completed "as soon thereafter as possible." I would therefore hold that defendants did not violate any Medicare regulations by submitting final claims with doctors' signatures obtained after care had ended but before defendants submitted the claims for payment.

---

[1]As the majority noted, the 2014 Manual did not have this language. Maj. Op. at 12 n.6 (citing R. 58-1, 2014 Medicare Benefit Policy Manual § 30.5.1, Page ID 377–78). And as the district court pointed out, even if the 2015 manual did create a new rule, it does not apply to conduct that occurred before that date and is therefore inapplicable to defendants' conduct in 2011. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (noting that "[r]etroactivity is not favored in the law" and holding that retroactive application of Medicare regulation was inappropriate because law did not include express authorization for retroactive rulemaking).

Because this reasoning applies equally to face-to-face documentation, I would hold that Prather has not stated a valid claim based on the theory that defendants violated the regulations.

**II**

The majority takes a different view.  It asserts that "[t]he regulation's use of the phrase 'as soon thereafter as possible' suggests plainly that the analysis of whether a certification complies requires that the reason for any delay be examined."  Maj. Op. at 16.  Under this approach, home health agencies must explain themselves any time a physician completes a certification after the plan of care is established.  This conclusion is unsupported.  And how the majority arrives at it is troubling.[2]

As an initial matter, the regulations do not require that *anyone* examine "the reason for any delay" in securing signatures—let alone that the federal judiciary.  For the majority to create this supervisory role for itself, it must cobble together weak, inapposite authority.

Because the relevant regulations do not support a valid-excuse rule, the majority must turn to a separate regulation related to "other forms of health services."  Maj. Op. at 17–18, n.4 (quoting 42 C.F.R. § 424.11(d)(3)).  That regulation imposes a true "timeliness" requirement and "[d]elayed certification and recertification statements are acceptable when there is a legitimate reason for delay" provided the statements "include an explanation of the reasons for the delay." *Id.*  The majority cites § 424.11(d)(3) as evidence of a "general principle" that Medicare requires reasons for delays.  What § 424.11(d)(3) actually shows is that CMS knows how to impose an explanation requirement when CMS thinks it is warranted.  If Congress or CMS had intended for this rule to apply to home health services, they would have said so.  But neither the statute nor the regulations provide even a hint that home health agencies must explain delays in securing certifications.

Without a rule on point, the majority makes a curious and disturbing move: it somehow construes the *absence* of a requirement for defendants to explain any delay as a license for the court to create one.  *See* Maj. Op. at 18 (noting that "nothing in the regulatory or statutory context counsels" against requiring an explanation for delay).  To impose a new requirement on

---

[2]Again, this same analysis applies to face-to-face documentation.

home health agencies, the majority thinks that the court only needs to find that current regulations do not prohibit it. It is Congress's job to pass statutes, the agencies' job to write regulations, and our job to interpret them. It is *not* our job to create new rules—especially when our creations would, as in this case, be applied retroactively to result in massive liability.

The majority tries to normalize this overreach. The only authority it can cite, however, is non-binding Second Circuit case law on unrelated education regulations. *See D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503 (2d Cir. 2006), *op. amended in part by* 480 F.3d 138 (2d Cir. 2007). In *D.D.*, the Second Circuit concluded that the phrase "as soon as possible" required an inquiry into the reasons for delays in implementing education programs for disabled students. *Id.* at 514–15. Importantly, the Second Circuit relied on guidance from the Secretary of Education to reach this result. *See id.* The Secretary suggested that "as soon as possible" meant "without undue delay," "with very limited exceptions," and then provided examples of when delay would be justified. *Id.* at 513–14. "Based on this commentary," the Second Circuit determined that the time frame "necessitate[d] a specific inquiry into the causes for delay." *Id.* at 514. In this case, neither Medicare nor CMS indicated that, before 2011, home health agencies had to explain any delay in obtaining doctors' certifications. If anything, *D.D.* establishes merely that we should pay careful attention to commentary from the relevant agency. And the only commentary we have from CMS indicates that defendants were allowed to submit certifications when they did.

The majority also appeals to what it views as common sense: "No responsible litigant or attorney asked by a court during oral argument to submit a supplemental brief 'by the end of the week or as soon thereafter as possible' would wait three months to do so." Maj. Op. at 18. That might be true, but the analogy is flawed. A litigant would not wait three months to file a supplemental brief because courts have made it clear that they would not consider such a brief. Medicare, on the other hand, has never indicated that it would consider claims with certifications or face-to-face documentation signed after care has ended *only if* home health agencies provide a valid explanation for any delay. If Medicare *had* indicated that defendants' practice was unacceptable prior to 2011, then the majority would have a point. Instead, the majority chides defendants for failing to meet a requirement in 2010 and 2011 that the court only invented today.

Lastly, the majority cites what it considers pragmatic reasons for imposing its rule. These include a belief that its rule will deter Medicare fraud. But the majority never addresses its rule's burdens and uncertainties—Medicare and courts would have to proceed on a case-by-case basis to examine the validity of proffered reasons for delay without a guide as to what an "acceptable" reason might be. Unsurprisingly, the majority also avoids considering the pragmatic reasons why we leave promulgating regulations to agencies and not the courts.

Bad facts make bad law. So, apparently, do bad complaints. One might suspect the majority never addresses these issues because it has actually adopted Prather's theory: that "certifications were obtained months late due only to the fact that Brookdale had accumulated a large backlog of Medicare claims, which itself arose solely because of Brookdale's 'aggressive solicitation' of its residents for Medicare-billable treatments that were not always medically necessary or did not need to be performed by nurses who billed to Medicare." Maj. Op. at 20. Thus, although Prather disclaimed any argument that defendants provided unnecessary care, and although the majority concedes that Prather did not adequately plead that defendants falsified any documents, the majority endeavors today to manufacture falsity in defendants' claims because it *believes* Prather's unpled and disclaimed theory of the case. I find this rationale wholly unpersuasive.

**III**

The majority's reasoning for holding that Prather states a claim based on the requests for anticipated payment is also unpersuasive. My entire analysis for final-payment requests applies to anticipated-payment requests. Moreover, we have additional guidance from CMS to indicate that home health agencies do *not* even need to submit signed certifications and face-to-face documents with their requests for anticipated payment, or "RAPs" as the guidance refers to them.

The Medicare Claims Processing Manual (MCPM) provided by CMS states that home health agencies can submit an RAP to Medicare when the four following conditions are met: (1) an outcome assessment is complete, or there is an agency-wide internal policy establishing that the outcome data is finalized for transmission to the State; (2) a physician's verbal orders for home care have been received and documented; (3) a plan of care has been established and sent

to a physician; and (4) the first service visit under that plan has been delivered. MCPM, Ch. 10, § 10.1.10.3 (May 2011). The manual does not mention anything about certifications or face-to-face documentation with regard to RAPs. Medicare contractors have also indicated that RAPs do *not* require signed certifications or face-to-face documentation. Ask-the-Contractor Questions and Answers, June 21, 2015 at No. 5, *available at* https://www.cgsmedicare.com/hhh/education/faqs/act/act_qa062415.html (citing the Medicare Manual and the MLN article) ("The physician certification must be signed before the final claim is submitted. *The RAP can be billed before the certification is signed.*") (emphasis added). Given the near-uniformity of CMS guidance regarding RAPs and the lack of any indication that RAPs require signed certifications or face-to-face documentation, I would hold that Prather has failed to state a claim that defendants violated the Act when submitting RAPs.[3]

## IV

Finally, I must also disagree with the majority's decision to apply a never-before-used exception to Rule 9(b) for Prather's RAP-related claims. To state a claim under the False Claims Act, 31 U.S.C. § 3729, a plaintiff must sufficiently plead:

> [1] that the defendant [made] a false statement or create[d] a false record [2] with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information; [3] that the defendant . . . submitted a claim for payment to the federal government; . . . and [4] that the false statement or record [was] material to the Government's decision to make the payment sought in the defendant's claim.

*U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 618 F.3d 505, 509 (6th Cir. 2010). Like other claims asserting fraud, complaints alleging violations under the Act "'must comply with Rule 9(b)'s requirement that fraud be pled with particularity.'" *U.S. ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 407 (6th Cir. 2016) (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011)). Having already explained that Prather never plead falsity, I would

---

[3]The majority concedes that, under 42 C.F.R. § 409.43(c)(3), an RAP need not include a "physician signed plan of care." Maj. Op. at 22. The regulations themselves have no requirement that RAPs include any signed documentation. I find it unlikely that the regulations would specifically *allow* RAPs without signed plans of care while imposing an unstated requirement that they include signed certifications—particularly in light of Medicare guidance documents indicating that certifications are *not* required.

also hold that Prather has failed to allege with particularity that defendants submitted claims for payment.

Our cases have consistently affirmed that "we impose a 'strict requirement that relators identify actual false claims.'" *U.S. ex rel. Eberhard v. Physicians Choice Lab. Servs., LLC*, No. 15-5691, 2016 WL 731843, at *4 (6th Cir. Feb. 23, 2016). As the majority concedes, Prather has not done so. Maj. Op. at 29. However, "we have 'left open' the possibility that Rule 9(b)'s requirement might be relaxed in some circumstances." *Id.* We have indicated that Rule 9(b) "may be relaxed when, even though the relator is unable to produce an actual billing or invoice, he or she has pled facts which support a strong inference that a claim was submitted." *Chesbrough*, 655 F.3d at 471. For example, we have suggested we might relax Rule 9(b)'s standard in a case where "the relator worked in the billing department of the hospital, she described the alleged fraud in great detail, and she allegedly possessed first-hand knowledge that false claims had been submitted to the government." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 n.12 (6th Cir. 2007).

The purpose underlying this potential exception is to allow a relator to bring a claim when it would be impossible to allege fraud with particularity—to relax the standard "in circumstances where a relator demonstrates that he cannot allege the specifics of actual false claims that in all likelihood exist, and the reason that the relator cannot produce such allegations is not attributable to the conduct of the relator." *Id.* We have never applied this exception, but the majority would use this case to do so.

As I do not believe defendants violated Medicare regulations, I would not even address this issue. But even if Prather is deemed to have adequately alleged a "falsity," it is merely technical noncompliance and not a truly "fraudulent scheme." I would not lower Rule 9(b)'s pleading standard for the presentment requirement simply because defendants secured doctors' signatures "too late." Her complaint lacks factual allegations to support the fraudulent scheme Prather actually believes existed: that defendants provided care without any doctor involvement. The majority has gone to great lengths to craft a way around this deficiency by reframing Prather's allegations as claims that defendants submitted RAPs with late signatures. I would not go even further by then lowering Rule 9(b)'s pleading standard for the first time.

**V**

At the end of the day, this case is about late signatures, not false claims. The majority's new requirement for Medicare payment might be a good idea, but that is something for Congress or CMS, not two appellate judges, to decide. And even if some cases may warrant relaxing Rule 9(b)'s pleading standard—an exception I am not convinced we should adopt—the proper case should involve a truly *fraudulent* scheme. Because Marjorie Prather's complaint fails to state a valid claim that defendants submitted false claims, I respectfully dissent.