JANE B. STRANCH, Circuit Judge, concurring in part and dissenting: in part. CONCURRING IN PART AND DISSENTING IN PART The American health card system, the context for this case, is not only a life and death industry, but also the source of one in every eight* jobs in the United States and one dollar of every six in our gross domestic product. See Employment by Major Industry Sector, Bureau of Labor Statistics (Dec. 8, 2015), "https://www.bls.gov/ emp/ep_table_201.htm; National Health Expenditure Projections 2016-2025, Ctrs. for Medicare & Medicaid Servs. at 1, https://www.cms.gov/Research-Statistics-Dataand-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/ Downloads/proj2016.pdf (last visited Oct. 20, 2017). The scale of health care fraud is comparably huge. As I have previously discussed, rampant health care fraud in the United States likely costs Medicare and Medicaid between $30 and $98 billion each year. United States ex rel. Doghramji v. Cmty. Health Sys., Inc., 666 Fed.Appx. 410, 419 (6th Cir. 2016) (Stranch, J., concurring). That cost is transferred to us all in the forms of higher health care bills, premiums, co-pays, and taxes. The False Claims Act (FCA), the legal vehicle that relators use to bring claims identifying and combatting that fraud, operates on the same massive scale, having allowed the United States to recover over $31 billion between 2009 and 2016. See Justice Department Recovers Over $4.7 Billion From False Claims Act Cases in Fiscal Year 2016, U.S. Dep’t of Justice (Dec. 14, 2016), https://www.justice.gov/opa/pr/justice-department-recovers-over-47-billion-false-claimsact-cases-fiscal-year-2016. Qui tarn relators are critical to the FCA’s operation. Their suits are responsible for over sixty-three percent of FCA recoveries between 1986 and 2008. Doghramji, 666 Fed.Appx. at 419 (Stranch, J., concurring). When drafting the FCA, “Congress wrote expansively* meaning ‘to reach all types of fraud, without qualification, that might result in financial loss to the Government.’ ” Cook County v. United States ex rel. Chandler, 538 U.S. 119, 129, 123 S.Ct. 1239, 155 L.Ed.2d 247 (2003) (quoting United States v. Neifert-White Co., 390 U.S. 228, 232, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968)). Congress has not backed down from this expansive position. To the contrary, Congress amended the Act in 1986 “to strengthen the Government’s hand in fighting false claims, and to encourage more private enforcement suits,” Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, 298, 130 S.Ct. 1396, 176 L.Ed.2d 225 (2010) (citations and internal quotation marks, omitted), and then expanded its scope again in 2009, Boegh v. EnergySolutions, Inc., 772 F.3d 1056, 1062 (6th Cir. 2014). In the 2009 amendments, Congress recognized the important role of qui tarn relators, explained that the “effectiveness of the False Claims Act ha[d] recently been undermined by court decisions which limit the scope of the law,” and expanded FCA protections for' relators. S. Rep. No. 111-10, at 4 (2009). This case arises in the context of that Congressional concern and is reviewed under the post-2009 provisions of the FCA. I respectfully dissent from the majority opinion except for its public-disclosure bar analysis in Part 11(D)(1). I concur in the holding that the public-disclosure bar does not apply to fraudulent schemes that continue or are restarted following a defendant’s entry into an agreement with the government. Maj. Op. at- 917-20. A contrary rule would-allow a company to use publicly disclosed agreements to avoid liability for future bad acts that mirror previous misdeeds. The rule announced today, on the other hand, ensures that the public-disclosure bar does not prohibit a challenge to improper post-agreement behavior. I turn to the reasons for my dissent. The relators-allege that the defendants violated the FCA by once again submitting hundreds of millions of dollars of claims for prescriptions of an illegally promoted drug. The complaint alleges facts based on the relators’ personal 'knowledge, collaboration with others, and extensive research. At this stage in the proceedings, “the Court must construe the complaint in .the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible on its face.” United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc., 838 F.3d 750, 761 (6th Cir. 2016) (quoting United States ex rel. SNAPP, Inc. v. Ford Motor Co., 532 F.3d 496, 502 (6th Cir. 2008)). When sounding in fraud, claims brought under the FCA must satisfy Rule 9(b)’s requirement that the relevant fraudulent circumstances be stated “with particularity.” Fed. R. Civ. P. 9(b); see also United States ex rel. Bledsoe v. Cmty. Health Sys., Inc., 501 F.3d 493, 504 (6th Cir. 2007). Particularized pleading in this context typically requires a showing of a false claim that was actually submitted to the government. Bledsoe, 501 F.3d at 505 (“A relator cannot meet this [pleading] standard without alleging which specific false claims constitute a violation of the FCA.”). But, as our sister circuits have concluded, particularity is not necessarily synonymous with representative samples. Particularity may also be satisfied where a relator “al-leg[es] particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.” United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009); see also United States ex rel. Chorches v. Am. Med. Response, Inc., 865 F.3d 71, 86 (2d Cir. 2017); United States ex rel. Heath v. AT&T, Inc., 791 F.3d 112, 126 (D.C. Cir. 2015); United States ex rel. Thayer v. Planned Parenthood of the Heartland, 765 F.3d 914, 917-18 (8th Cir. 2014); Foglia v. Renal Ventures Mgmt., LLC, 754 F.3d 153, 156-57 (3d Cir. 2014); Ebeid v. Lungwitz, 616 F.3d 993, 998-99 (9th Cir. 2010); United States ex rel. Lemmon v. Envirocare of Utah, Inc., 614 F.3d 1163, 1172 (10th Cir. 2010); United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13, 30 (1st Cir. 2009); United States ex rel. Lusby v. Rolls-Royce Corp., 570 F.3d 849, 854 (7th Cir. 2009). When applying a strict pleading standard in eases prior to Prather, we left open the possibility that a relator can survive a motion to dismiss when the relator “has pled facts which support a strong inference that a claim was submitted.” Prather, 838 F.3d at 769 (quoting Chesbrough v. VPA, P.C., 655 F.3d 461, 471 (6th Cir. 2011)); see also United States ex rel. Sheldon v. Kettering Health Network, 816 F.3d 399, 414 (6th Cir. 2016). In Prather, we noted that every circuit that has applied a heightened pleading standard “has retreated from such a requirement in cases in which other detailed factual allegations support a strong inference that claims were submitted.” Prather, 838 F.3d at 772 (citing Thayer, 765 F.3d at 917-18; Lemmon, 614 F.3d at 1172; United States ex rel. Walker v. R&F Props. of Lake Cty., Inc., 433 F.3d 1349, 1360 (11th Cir. 2005)). We then “confirmed] our adoption of that exception,” holding that a plaintiff can “survive a motion to dismiss by pleading specific facts based on her personal billing-related knowledge that support a strong inference that specific false claims were submitted for payment.” 838 F.3d at 773. As was the case in Prather, we are confronted in this case with “detailed factual allegations [that] support a strong inference that claims were submitted.” Id. at 772. In light of our governing precedent, I think that the majority erred by failing to read the third amended complaint in the light most favorable to the plaintiff and to accept all factual allegations as true. That complaint points to off-label prescriptions that were written by physicians targeted in the alleged scheme and paid for by state Medicaid programs—and so, ultimately, submitted to the United States government. For example, “Dr. 3” was targeted by defendants in their marketing scheme to increase off-label sales of Abilify starting in May 2007. Dr. 3 wrote a prescription for a twelve-year-old patient that was filled on January 29, 2008 at a specific CVS pharmacy; the $370.59 bill was paid by Massachusetts Medicaid. The use was off-label because, at the time, Abilify had not been medically indicated for patients under the age of thirteen. As another example, in April 2010, relator Ibanez personally sat in on a meeting discussing how to promote off-label use of Abilify to a specific child and adolescent psychiatrist in Cincinnati. That doctor had just written 124 prescriptions for Abilify that had been filled between November 2009 and January 2010 and paid for by Kentucky Medicaid. As discussed in the majority opinion, •prescriptions for off-label use of Abilify were written for juvenile D.M. and paid for by Ohio Medicaid. Maj. Op. at 920-21. The majority is concerned with the lack of information about D.M.’s receipt of Medicaid reimbursements and the gap between promotion and filling the prescription. Id. But the complaint explains that relator Ibanez himself targeted the facility where D.M. was first prescribed Abilify during the year when he was first prescribed it. The complaint alleges that D.M. “routinely filled his Abilify prescriptions at Kroger pharmacies” and was reimbursed by Ohio Medicaid; the 2015 prescription the majority finds insufficiently linked to the initial promotion is offered as “but one example” of that continuous trend from the initial prescription in 2010. These examples, and the many others with which the complaint abounds, provide adequate and fair notice to defendants of the claims brought against them. The First Circuit correctly recognized that a relator alleging that the defendant induced third parties to file false claims can “satisfy Rule 9(b) by providing ‘factual or statistical evidence to strengthen the inference of fraud beyond possibility’ without necessarily providing details as to each false claim.” Duxbury, 579 F.3d at 29 (quoting United States ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 733 (1st Cir. 2007)). These relators employed this method to support the examples of false claims described above. First and foremost, the re-lators have personal knowledge of the corporate strategies employed to promote off-label uses of Abilify. They also provide extensive statistical evidence that creates the strong inference both that this scheme occurred and that it resulted in substantial claims paid by the government. The majority opinion points out that the facts in this complaint are not identical to those in Prather, where the relator alleged “specific personal knowledge that relates directly to billing practices.” Maj. Op. at 915 (quoting Prather, 838 F.3d at 769). I agree that the relators in this case were not personally involved in billing. However, the relators here have nonetheless “pled facts which support a strong inference that a claim was submitted.” Prather, 838 F.3d at 769 (quoting Chesbrough, 655 F.3d at 471). Relators, unlike the government, do not have many legal tools available to discern details of claims during the pleading stage. Making those legal tools available is precisely the purpose of discovery. The facts in the third amended complaint—detailed examples of the alleged scheme backed by personal knowledge and statistical evidence—are sufficient to satisfy Rule 9(b)’s requirement that the “circumstances constituting fraud” are stated with particularity. Fed. R. Civ. P. 9(b). In summary, I concur in the majority opinion’s holding that the public-disclosure bar does not apply here. I cannot agree with the remainder of the majority opinion because the relators have pled facts sufficient to satisfy Rule 9(b) by identifying specific claims and supplementing those identifications with personal knowledge and statistical evidence. Thus, under our precedent and in accordance with the purposes of the FCA specified by Congress, this case should not be dismissed. I therefore respectfully dissent.